LOTTINGER, Judge.
This is a tort action arising out of an automobile accident which occurred in the Parish of East Baton Rouge on September 20, 1957, wherein the plaintiff’s minor daughter, Kathleen Davis, sustained physical injuries. In his original' petition the plaintiff sought, individually, the costs and expenses which he had suffered together with the sum of $500 for estimated future medical expenses and, for and on behalf of his minor child, the sum of $25,000 for past and future pain and suffering. By supplemental petition filed on the day of trial the plaintiff increased his demand for future medical expenses to the sum of $2,000.
Liability was stipulated thus leaving as-the sole issue presented to the Lower Court that of quantum. Following the taking of lay and medical testimony the trial judge awarded the plaintiff, indvidually, the sum of $264.20 and, for and on behalf of his. minor child, the sum of $500. The plaintiff has appealed.
The record reveals that the accident occurred about 11:30 o’clock p. m. about two blocks from a restaurant known as the Log Cabin situated on the Air Line Highway. Immediately after the collision Kathleen Davis, together with her boy friend and girlfriend, who had all been together in the same automobile, were given a ride to the Log Cabin where the girl friend called her mother to inform her of the accident. From, there they walked back to the scene of the accident and were then taken by ambulance to the Baton Rouge General Hospital. Kathleen was examined by Dr. Thom and after an hour or so released to go home.
It appears that the plaintiff and his wife-wanted Kathleen to be examined by Dr. Thomas Campanella, orthopedic specialist of Baton Rouge, so she re-entered the hos *89 pital the next morning where she remained for four days under Dr. Campanella’s care. Initial examination showed a contusion of the back and abrasions of the face. Dr. Campanella testified as follows:
“ * * * The reason for admitting her was to check her blood pressure, her pulse and respiration and to determine whether or not she had any cerebral damage. She remained pretty well stabilized throughout the hospitalization time, in other words, the blood pressure remained normal, the pulse was normal, and she did not present any findings to indicate that there was any gross damage to her brain. She was discharged from the hospital and then I saw her at the office on November 7,1957, at which time she was complaining of headaches, grogginess, and pain in her head, particularly on the left side of her head, and pain in her back. This pain in her back was aggravated by sitting up. The examination at that time was negative. I felt that she was suffering from a simple contusion of the back. She did not have any limitation of motion and did not have any spasms. The pupils reacted to light and accommodation, therefore, she did not have any cerebral damage. She was seen again on 12/10/57 and again she was complaining of backache and headache, particularly a throbbing type of pain on the left side.
“Q. Left side of her head? A. Yes. The examination on 12/10/57 was negative. Again I felt that this was attributed to perhaps a mild cerebral concussion and in time it would disappear. The blood pressure at that time was still normal, 110 over 70. However, because she was complaining of these headaches I thought that she should consult a neurosurgeon at that time and for that reason I told her to see Dr. Forman. The youngster was too much excitable. She was nervous and because of the persistence of the headaches I felt that she should see a neurosurgeon, someone who was a specialist in the field. In conclusion, I felt that this youngster had mild cerebral concussion without any cerebral damage and that she had a contusion of the back which persisted from the initial examination of 9/21/57 until my last examination of 3/11/58. However, this was all subjective and no objective findings were noted.”
The record discloses that Kathleen was seen by Dr. Duane Forman, neuro specialist of Baton Rouge, as recommended by Dr. Campanella. The former rendered a report to plaintiff’s counsel but was not called upon to testify on behalf of plaintiff. Defense counsel sought to introduce into evidence a copy of the report but the offering was successfully objected to by counsel for plaintiff.
On May 1, 1958 Kathleen was examined by an ear, nose and throat specialist, Dr. Gerald Joseph. His report, introduced into evidence as “Defendant Exhibit No. 1”, reads in part as follows:
“ * * * This young lady came to see me May 1, 1958, complaining of severe generalized headache, dizziness, and nausea, which she has been suffering since she was in an automobile wreck in September, 1957. She was seen immediately following the injury and has' been under the care of Dr. Duane Forman of this city, and says that she was told that she had had a cerebral concussion and that her situation was proceeding as should be expected with this diagnosis. In addition to her nervousness, tension, and undue irritability, she had had some severe nose bleeds which she says were worse at the time she was having the upsets described above. It was apparently particularly in this regard that I was consulted in the matter.
“Examination of the ear, nose and throat system at this time revealed a marked hypertrophy of the tonsils with chronic follicular infection, and mild cervical adenitis in the anterior chains *90 of the neck on both sides. Other than this there was no evidence of active significant ear, nose and throat disease. There was no apparent source of nose bleed at the time of this examination. X-rays of the skull and paranasal sinuses revealed no abnormality. In addition, examination of the eyes revealed a normal visual acuity, 20/20 SJ-1 in each eye. There was no eye pathology except a questionable fullness and blurring of the disc margins in the fundus of the right eye, inferior one-third. This was not of definite significance and is mentioned only for the sake of completeness. A refraction was done and no error of refraction in need of correction was found.
“In summation, it was felt following my examination of Miss Kathleen Davis that the young lady has had a cerebral concussion, and is exhibiting the usual sequelae therefrom. There is no ear, nose and throat disease, and no evidence of injury in the ear, nose and throat system. The concussive syndrome is within the realm of Dr. Duane Forman and not the type of disease which comes under my jurisdiction, in in the speciality of Otolaryngology. The girl’s mother was informed of the situation and as regard the medical legal aspects in the matter, it is felt that there is no evidence for recovery or compensation on the basis of any definite ear, nose and throat or eye injury or disease. The cerebral concussion and evaluation of disability therefrom could best be clarified by Dr. Forman’s reports.”
Dr. Charles McVea examined Kathleen on July 7, 1958. His testimony, in part, is as follows:
“Q. Dr. McVea, did you reach any conclusion as to what type of injury, if any, this young lady received in this accident? A. I thought from the history that the young lady had suffered a contusion of her head and perhaps a mild cerebral concussion. The headaches which have been described to me do not follow any particular pattern,, and I could not relate the headaches, to the accident. The physical examination at the time that I saw her did not indicate to me that she had at that time anything wrong with her back.
“Q. Did you have any reasons from-your physical examination to detect any medical pathology with this girl? A. No, Sir, I did not find anything medically wrong with her on physical examination.
“Q. Doctor, did you observe this young lady pretty carefully while she was with you ? A. I believe so, yes.
“Q. Did you detect any evidence of psychiatric trouble or need for psychiatric treatment? A. No, sir, there was no indication that she was psychotic to my way of thinking.
“Q. Did she appear to be a normal teenage young lady? A. I thought she was, yes, sir.”
The principal witness who testified on behalf of the plaintiff was Dr. L. F. Ma-gruder, psychiatrist, who first examined Kathleen on September 19, 1958. This doctor saw her on five occasions between that date and the date of the trial which was October 15, 1958. He stated that it was his opinion based on the history that Kathleen was suffering from post-traumatic neurosis and that she needed psychiatric treatment over a period of twelve to eighteen months the cost of which would be from $1,200 to $1,300 a year. The history which was given this doctor appears to' be the following:
“Q. Dr. Magruder, what were some of the symptoms she demonstrated to' indicate that she needed psychiatric treatment? A. Complaints. She complained of headaches, she has a constant headache all the time, from' shortly after awakening throughout the day, *91 .and tension, nervous tension. A feeling of shakiness, irritability, she cannot get along with people well. She ■says she has only one friend and they fuss all the time. Fear of riding in •cars since the accident, and * * * those are some of the symptoms, some ■of her complaints in addition to that were extreme restlessness, picking at her fingers, hands wet with sweat although she was in a room where it was ■cool with air conditioning on her.
“Q. Did her history reveal anything concerning her school attend.ance? A. Yes. She says she can’t ■attend school because she can’t get up and recite, she can’t talk, and she breaks out crying and feels that she is going to pieces and she had attended school, but that she could not attend .anymore, and on the last interview she .asked me if I thought it was advisable for her to get a visiting teacher to teach her at home.”
The forcefulness of Dr. Magruder’s testimony is considerably reduced when the history presented to him is contrasted with the testimony of Miss Davis herself. First of all, both she and her parents freely admitted that she attended school during the 1957 — 58 term and in May of 19S8 was advanced from the ninth to the tenth grade at Istrouma High School in Baton Rouge. Further, it is clear that she did not refuse to go to school until the fall term of 1958, just a few days before the trial.
Nor does it appear that Kathleen entertained the fear of riding in automobiles which was communicated to Dr. Magruder. The record shows that Mr. Davis rented a home on Folse River and commuted the 21 miles to his work during the summer of 1958. Mrs. Davis admitted that Kathleen would often make the trip with him and spend the day in Baton Rouge visiting her sister or relatives or friends. Mrs. Davis also stated that Kathleen had a boy friend with whom she went out regularly to parties and other young peoples’ activities.
Kathleen testified that she intended to marry her boy friend. She further stated that during the summer of 1958 she had indulged in water skiing on Folse River. Indeed, Dr. McVea, who, as stated before, examined her on July 7th of that year, said that she had a good tan and that she had told him she had been swimming a good deal.
We cannot help but be impressed with the fact that none of the very prominent doctors who saw Kathleen recommended that she see a psychiatrist nor can we help but feel that had all the facts revealed by the record been presented to Dr. Magruder that his diagnosis could well have been otherwise. The award of the Lower Court strikes us as being fair and adequate and we see no such manifest error therein as to warrant an increase.
For the reasons assigned the judgment appealed from is affirmed.
Judgment affirmed.